[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 472 
This is an appeal from a decree of the Circuit Court of Montgomery County which validated and confirmed certain evidences of indebtedness proposed to be issued by the Alabama Municipal Electric Authority (Authority) and, in addition, authorized the execution of certain service agreements (Contracts) between the Authority and several state municipalities, utilities, and electric boards (Participants) for the purchase of electric power and energy.
The Authority is a public corporation of the State organized under the provisions of Act No. 81-681 (Act), now codified as §11-50A-1, et seq., Code 1975. Generally, the Authority is empowered to construct, own and operate electric distribution systems and related facilities to assure that municipalities, utilities and electric authorities in the State have alternative sources of bulk electric power and energy in addition to those presently available and to operate their electric distribution systems in a dependable, efficient and economical manner.
The applicable proceedings and pertinent documents involved in the proposed financing sought to be validated are as follows:
 NOTE RESOLUTION
On 11 March 1982 the Authority's Board of Directors (Board) adopted a resolution authorizing (1) the issuance, execution and delivery by the Authority of its Bulk Power Supply Services Revenue Notes (Note Resolution), (2) the execution and delivery of a loan agreement (Loan Agreement) with The Alabama National Bank of Montgomery (Bank), (3) the execution and delivery of the Contracts between the Authority and each of the Participants and, (4) the filing of a complaint pursuant to §11-50A-10 and § 11-50A-11, Code 1975. The Note Resolution authorized the borrowing of the maximum aggregate principal amount of $3,000,000. Each of the notes authorized in the Note Resolution is to be dated the date of issuance, is to be payable to the lender or order in the amount evidenced thereby, is to be numbered from one up, is to be in such denomination as may be determined at the time of each borrowing evidenced thereby and is to mature on the first day of the month following the expiration of forty months from the date the first note is issued. The Note Resolution further provides that the notes are to bear interest from their date and their maturity at such rate or rates, fixed or floating, not exceeding 20% per annum, all as shall be provided for by the Authority prior to each borrowing or by contract authorized by the Board to be entered into by the Authority, with interest payable on 1 March and 1 September of each year. The notes and the interest thereon shall be payable at the principal office of the Bank and the notes reserve to the Authority the option of prepaying and redeeming any of the notes at any time *Page 473 
upon payment of the principal amount and interest accrued to date of prepayment. The Note Resolution provides that the notes shall not be general obligations of the Authority but shall be payable solely out of revenues derived by the Authority from the Contracts or, in certain events, a portion of the proceeds derived from the sale of the Authority's long-term bonds. In the Note Resolution, the Board pledges the revenues derived by the Authority from the Contracts solely for the payment of the principal of and interest on the notes.
 LOAN AGREEMENT
On 13 May 1982, the Authority and the Bank entered into the Loan Agreement. It represents the terms and conditions of a portion of the $3,000,000 borrowing authorized by the Authority in the Note Resolution. Pursuant to that agreement, the Bank will lend the Authority a principal sum not exceeding $1,350,000 which loan will be evidenced by the notes. The notes will bear interest at a per annum rate equal to 63% of the Bank's prime lending rate, providing that such interest rate may never exceed 20% per annum. The proceeds of the notes shall be deposited in a Notes Proceeds Account as provided for in the Note Resolution and shall be disbursed out of that account to pay the costs of providing Bulk Power Supply Services, including without limitation (1) the costs of a feasibility study, (2) the costs incurred in connection with the issuance of the notes, and (3) the costs of reimbursing the Municipal Electric Utility Association of Alabama for monies advanced by that association to the Authority. The feasibility study to be financed from note proceeds will determine whether it is practical for the Authority to finance, require, construct, operate and maintain electric generation, transmission and distribution facilities in order to provide the participants with an alternative source of bulk electric power and energy to operate their respective electric distribution systems.
 CONTRACTS
The Authority entered into Contracts with each of the Participants,[1] and each Participant will be required to pay a pro rata portion of the "Costs of Bulk Power Supply Services," defined in the Contract as:
 "`Costs of Bulk Power Supply Services' means the costs incurred by the Authority in providing Bulk Power Supply Services under the Contracts, including (without limitation) engineering, consultant and legal fees and expenses; costs of audits; costs of administrative and general overhead; costs of maintaining financial records and accounts and preparing reports required by the Contracts; the costs of reimbursing Municipal Electric Utility Association of Alabama for any moneys that may, prior to the issuance of the Notes, have been advanced to the Authority by Municipal Electric Utility Association of Alabama for payment of costs incurred by the Authority in providing Bulk Power Supply Services to Members of the Authority prior to the execution of the Contracts; the principal of and interest on the Notes and any other obligations issued by the Authority to finance the provision of Bulk Power Supply Services (whether or not the proceeds thereof are actually expended for such purposes, and the fees and expenses of fiduciaries and other items of expense incurred in connection with the issuance of any such obligations; provided, however, that no such cost, fee or expense (or portions thereof) paid out of moneys derived by the Authority from the issuance of any of its obligations shall be considered a `Cost of Bulk Power Supply Services'; and provided further, that in the event the principal of or interest on any obligations issued by the Authority to finance the provision of Bulk Power Supply Services is paid by the Authority *Page 474 
out of moneys derived from (a) such obligations (including any income earned by the Authority from the investment of the proceeds thereof) or (b) the issuance of other obligations by the Authority, the principal of or interest on the obligations so paid shall not be considered a `Cost of Bulk Power Supply Services.'"
The pro rata cost to each participant is based on the number of kilowatt hours purchased by the respective Participant during the Participant's preceding fiscal year. Each Participant's allocated cost is payable solely out of the revenues to be derived by the respective Participant from the operation of its respective electric system, subject to certain prior lien pledges heretofore made by such Participant. The liability of the Participants under their respective Contracts for the payment of the costs of Bulk Power Supply Services to the Authority is several and not joint, each Participant being liable only for its allocated cost.
This action was commenced under and pursuant to § 11-50A-10
and § 11-50A-11, Code 1975. The complaint was filed on behalf of the Authority on 13 May 1982 in Montgomery County circuit court. On that same date, the circuit court entered an order scheduling the case for hearing on 16 June 1982 to show cause why the circuit court should not validate and confirm the Notes, Contracts, Loan Agreement, and all proceedings had or taken in connection therewith. That order also directed the clerk of the court to effect notice of the hearing to the taxpayers and citizens of the State by publication in a newspaper customarily published not less than five days during each calendar week in the cities of Montgomery, Birmingham,Mobile, and Huntsville, once a week for three consecutive weeks before the day of the hearing set above. The Participants and the Bank were joined as parties defendant because of their execution of, respectively, the Contracts and the Loan Agreement, which documents were sought to be validated by the circuit court. The case was submitted on the pleadings, the documents introduced in evidence in open court, and the oral testimony taken in open court. On 16 June 1982 the circuit court entered a decree validating and confirming the Notes, the Loan Agreement and the Contracts. Raimon G. Thomas, one of the defendants below, as a taxpayer and citizen of this State filed this appeal.
Appellant Thomas raises twelve issues on appeal. For ease of reference we will set out each of those issues together with our answer, in seriatim.
 (1) Does the Act fail to comply with the requirements of Section 45 of the Alabama Constitution?
The Constitution of Alabama, 1901, § 45, requires, in part, that "[each] law shall contain but one subject, which shall be clearly expressed in its title."
 "The purposes of the `single subject' requirement Const. of Ala., 1901, § 45, are generally stated as: (a) notification to the public of the nature of the pending legislation; (b) avoidance of fraud on the legislature by inadvertent passage of provisions not related to the title, and; (c) prevention of logrolling legislation. Boswell v. State, 290 Ala. 349, 276 So.2d 592, appeal dismissed 414 U.S. 1118, 94 S.Ct. 855, 38 L.Ed.2d 747 (1973). The title of a bill need not specify every provision contained. The `one subject' test of § 45 is satisfied when the bill's provisions are all referable to and cognate of the subject of the bill. Boswell, supra; Opinion of the Justices, 275 Ala. 254, 154 So.2d 12 (1963). . . ."
Opinion of the Justices, 294 Ala. 555, 319 So.2d 682 (1975).
Appellant contends that because the Act does not specifically mention "feasibility study" as a power granted to the Authority it violates § 45 and the Authority is, therefore, outside the subject-matter of its authorized powers when it attempts to issue notes to finance such a feasibility study. We believe, as the appellees do, that a necessary concomitant of, or prerequisite to, the Authority's power to construct and operate massive electrical generation projects, or any other project germane to those powers authorized in the Act, is the power to *Page 475 
ascertain in advance, before the expenditures of large quantities of monies, the economic, engineering, and financial practicability of a proposed project. The applicable rule of law concerning this issue was well-stated in Kendrick v. Boyd,255 Ala. 53, 51 So.2d 694 (1951):
 "In line with this premise, the law has become established that when there is a fair expression of the general subject of the act in its title, all matters reasonably related to it, including all necessary agencies or instrumentalities which should facilitate the act's execution, are proper to be included as being cognate and germane to the title. We had occasion to deal with this specific question at some length in Newton v. City of Tuscaloosa, [251 Ala. 209, 36 So.2d 487], and with reference thereto pointed out, inter alia, (1) the liberal interpretation rule to be accorded this constitutional mandate; (2) that the subject of the act may be expressed in general terms and when so, everything subsumed under the general thought to make it a complete act, if cognate and germane thereto, is regarded as included in and authorized by it; (3) generality or comprehensiveness of the subject of the act is not a violation of the constitutional provision requiring that an act shall contain but one subject, which shall be clearly expressed in the title, a broad comprehensive subject justifying the inclusion of any matter except that which is incongruous or unconnected with the subject, provided the title is not uncertain or misleading; (4) the title of an act need not be an index to it, nor need it catalogue all powers intended to be bestowed."
Appellant also contends the Act further violates § 45 because its title fails to notify the public that the Authority is required to pay the State a fee in the amount of 2.2% of the gross receipts in lieu of taxes from all electric power sold by the Authority. We fail to find this discrepancy. The title of the Act contains the following clause: "to provide for certain payments to be made by the Authority in lieu of ad valorem, sales, use, license and severance taxation." It is our opinion that the "fee" enumerated above is embraced in the "in lieu of" provision in the title.
Appellant contends the Act adopts and incorporates by reference the judicial validation procedures found in §§11-81-220 through 11-81-227, Code 1975, and attempts to modify the provisions so adopted without publishing the amended provisions at length as required by § 45, Const. of Ala.
Section 45 provides, in pertinent part, that "no law shall be revived, amended or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended or conferred, shall be reenacted and published at length."
Section 10 of the Act (§ 11-50A-10, Code 1975) provides generally that "the validity of any Bonds may be determined in the manner provided in Sections 11-81-220 through 11-81-227, Code of Alabama 1975." This reference to an existing bond validation statute is first modified and particularized by correlating the defined terms used in the bond validation statute to certain of the terms defined in the Act. For example, the Act provides that "the term `unit' shall mean the authority; the term `organizing subdivision' shall mean the state", etc. This is done merely for the sake of explanation and convenience since the bond validation statute by its own terms does not apply to the Authority. This court has held that Const. of Ala., 1901, § 45, does not apply to acts which are independent and complete within themselves, although they adopt by reference merely the provisions of other laws on the same subject. In Re Opinion of the Justices, 262 Ala. 345,81 So.2d 277 (1955). In Newton v. City of Tuscaloosa, 251 Ala. 209, 219,36 So.2d 487 (1948), this court opined:
 "Though the complete execution of the act may not be particularized therein and an existing system for the regulation thereof is incorporated in the act by reference, this does not offend the Constitution. The new statute may specify the procedure to be followed by adopting by *Page 476 
reference the regulations of an existing statute. . . ."
The Act before us is in nowise an amendatory or revival act, nor does it extend or confer the provisions of other laws contrary to the provisions of § 45. The Act is original in form and in itself complete and intelligible.
On this same issue, appellant contends the title of the Act is misleading with respect to the jurisdiction of the Public Service Commission and also with respect to the nature and source of funds available to the Authority to pay for projects financed by bonds, bond anticipation notes and notes. It is, however, our opinion that what has heretofore been said about the validity of a title with respect to "germane" and "cognate" matters contained in the body of the Act is equally as pertinent to the two preceding contentions as they relate to the Const. of Ala., 1901, § 45. The subject of the Act is sufficiently expressed in the title and the Act contains no more than one subject.
 (2) Do the obligations incurred by each of these municipalities under the Contracts constitute a debt or indebtedness in excess of the limits provided by Section 225 of the Alabama Constitution?
For the benefit of the Participants, the Authority is required to provide, during the term of the Contracts, those services described in Section 3.1 thereof and defined as "Bulk Power Supply Services." The fee or price to be charged by the Authority to each Participant in return for the Bulk Power Supply Services so rendered is fixed as the "Allocated Cost," effectively defined in the Contracts as a portion of the total costs incurred by the Authority in providing Bulk Power Supply Services measured generally by the number of kilowatt hours of electric energy purchased by such Participant during a specified period of time.
Section 4.1 of the Contracts provides that the Municipality will pay to the Authority an amount equal to the Municipality's Allocated Cost and require the Authority to submit a bill to each Participant "not less often than once each Fiscal Year," equal to the Allocated Cost theretofore paid by the Authority during such period. However, Section 4.3 of each Contract limits the source of payment:
 "Section 4.3. Source of Payment. The Allocated Cost of the Municipality shall be treated as an expense of operating the System and shall be payable solely out of the revenues to be derived by the Municipality from the operation of the System for the Fiscal Year during which payment of its Allocated Cost becomes due as provided in Section 4.1 hereof. The obligations of the Municipality hereunder are expressly made subject to the Permitted Prior Lien Pledges. Neither the Municipality's obligation to pay its Allocated Cost nor any of the other agreements on the part of the Municipality herein contained shall constitute an indebtedness of the Municipality within the meaning of Section 225 of the Constitution of Alabama of 1901, as amended, or any other constitutional or statutory provision or limitation." (Emphasis added.)
The obligation of the Municipality to pay its Allocated Cost is discharged to the extent that at the time payment becomes due the Municipality has insufficient current revenues from its electric distribution system and such payments may not be compelled in a subsequent fiscal year even though the Participant might in that later year have sufficient revenues to make up the prior deficit.
In Hillard v. City of Mobile, 253 Ala. 676, 47 So.2d 162
(1950), this court opined that a contractual obligation for the payment of money that by its terms is payable solely from the funds received during the same fiscal year as the money becomes payable does not constitute a debt of the obligor and is, therefore, not an indebtedness as defined under Section 225, Const. of Ala., 1901, as amended by Amendment No. 268. See also, Opinion of the Justices, 335 So.2d 376 (Ala. 1976);Abrasley v. Jefferson County, 241 Ala. 660, 4 So.2d 153 (1941). This principle is a logical corollary of our constitutional concept of the term `debt': "the *Page 477 
obligation to pay more money than can be supplied by current funds, or by current revenues provided by lawful taxation for the fiscal year." Brown v. Gay-Padgett Hardware Co., 188 Ala. 423,66 So. 161 (1914); accord, Wharton v. Knight, 241 Ala. 218, 2 So.2d 310 (1941). Without regard to the amount of the Allocated Cost payments, they cannot be considered debt until the payments become due. Payments do not come due under the Contracts until the Authority incurs Allocated Costs and submits bills therefor to the municipalities. If they are paid by the municipalities out of the funds available at that time then no debt liability arises.
Therefore, we conclude the obligations under the Contracts do not constitute debts of the municipalities proscribed by § 225.
 (3) Do the validation proceedings provided for in Section 10 of the Act violate the due process clause of the Fourteenth Amendment to the United States Constitution?
Section 10 of the Act (§ 11-50A-10, Code 1975) describes the procedure to be followed by the Authority in obtaining judicial validation of the Notes. A necessary part of that procedure includes notice by publication to the taxpayers and citizens of the State:
 "Publication of a notice to the taxpayers and citizens of the State shall be made in the manner and at the time specified in Section 11-81-222 (d), except that publication shall be made in a newspaper customarily published not less often than five days during each calendar week in the Cities of Birmingham, Mobile, Montgomery and Huntsville. . . ."
Pursuant to the circuit court's order of 13 May 1982, the notice by publication called for in Section 10 of the Act was effected. Under Section 10 of the Act and § 11-81-221, Code 1975, the taxpayers and citizens of the State are necessary defendants in this proceeding. In accordance with the provisions of Section 10 of the Act and § 11-81-222, Code 1975, notice of the hearing required to be held by the circuit court was given to the taxpayers and citizens of the State through publication once a week for three consecutive weeks in those cities enumerated in § 11-50A-10. Under § 11-81-222, these provisions, authorizing service of process by newspaper publication in "bond validation suits," have been upheld by this court against the claim that such provisions do not comport with due process requirements. In Salmon v. BirminghamParking Authority, 294 Ala. 226, 314 So.2d 687 (1975), this court found that failure of the Legislature to require personal service on every "taxpayer and citizen" does not render these bond validation provisions unconstitutional.
The Authority is a public corporation of the State; it may operate anywhere within the State; its activities may properly be considered to be the concern of all citizens and taxpayers of the several members of the Authority. The Legislature could reasonably determine that notice by publication in newspapers published in the four largest cities of the State, was best calculated to apprise the large class of defendants of the commencement of these proceedings. The method of notice chosen must give reasonable assurance of actually giving notice in light of the other available means. Mullane v. Central HanoverTrust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). It is our opinion that, in this case, where the class of defendants is so large, no other practicable method of providing adequate notice is available or required. Service of process by publication is acceptable where other methods do not offer a sensible or effective way of notifying parties to an action of the pendency of that action. We opine that appellant's contention, that notice by publication was insufficient to satisfy the due process requirements of the Fourteenth Amendment, is without merit.
 (4) Is the Authority required to give notice to the taxpayers and citizens of each municipality which is a party to such Contract?
Appellant contends that the proceedings below fail to satisfy the requirements of Section 11 of the Act (§ 11-50A-11, Code 1975), which states as follows: *Page 478 
 "When payments required by the provisions of section 11-50A-17 to be made by any municipality authorized to contract with the authority pursuant to section 11-50A-17 are pledged as security for the payment of bonds sought to be validated, the petition for validation shall make parties defendant to that action every municipality which has contracted with the authority for the output, capacity, use or service of the project for which bonds are sought to be validated. Notice to the taxpayers and citizens of such municipality shall be made as provided in section 11-81-222 (d). Every other party, public or private, contracting with the authority in any manner with relation to the construction, ownership or operation of the project for which bonds are sought to be validated may also be made parties defendant to that action."
The record does indicate that no notice by publication pursuant to 11-81-222 (d) was given to the taxpayers and citizens of the municipalities.
Section 11-81-222 (d), Code 1975, states:
 "(d) Prior to the hearing of said case, the register or clerk of said court shall publish in a newspaper published in each organizing subdivision once each week for at least three weeks before the hearing, the first publication to be at least 18 days before such hearing, a notice addressed to the taxpayers and citizens of each such organizing subdivision requiring them at the time and place specified in the order providing for the hearing of such case to show cause, if any they have, why said obligations, the taxes, revenues or other means provided for their payment and any pledges or other covenants, provisions or agreements for the benefit of said obligations that may be referred to in the complaint should not be validated and confirmed; provided, that if no newspaper shall be published in any organizing subdivision then such notice shall be published as aforesaid in a newspaper published in the county or, if no newspaper is published in the county, then in a newspaper published within the state and having a general circulation in such organizing subdivision. By the publication of such notice all taxpayers and citizens of each organizing subdivision shall become parties defendant to said proceedings and the court shall have jurisdiction of them the same as if each of them were named individually as party defendants in said complaint and personally served with process."
Appellees argue that no special notice is required because §11-50A-11 is inapplicable to the Contracts. Appellees contend that section requires special notice only with respect to "Power Sales Contracts" described in § 11-50A-17, which states, in pertinent part, as follows:
 "(a) Any municipality, if authorized by resolution or ordinance of its governing body, may contract with the authority for the payment of any rates, tolls, fees, and other charges prescribed in this section and section 11-50A-18 by the authority for the output, capacity, use or service by the municipality of any projects or other resources of the authority or any of its facilities or undertakings." (Emphasis added.)
It is our opinion that § 11-50A-17 does not apply solely to the sale of electric power, but encompasses other aspects of the Authority's "resources" or "undertakings" for which the municipalities may wish to contract under the statute, and which, as already stated, includes feasibility studies and all other matters reasonably related to the subject-matter of the Act. Therefore, we find that proper notice was not given under § 11-81-222 (d); publication being required in each organizing subdivision under that section. Because the jurisdictional requirements under § 11-81-222 (d) were not met, we reverse and remand with respect to the validation and confirmation of the Contracts.
 (5) Is the Act a bill to raise revenue commenced in the Senate rather than in the House in violation of Section 70 of the Alabama Constitution?
Appellant contends that § 11-50A-7 provides for a fee in lieu of taxes which will *Page 479 
clearly have an impact on revenues available to the State and, as such, should have originated in the House.
In Beeland Wholesale Co. v. Kaufman, 234 Ala. 249, 260,174 So. 516 (1937), this court construed Section 70 as follows:
 "[w]hen an act has for its main purpose provision for the general welfare by enacting a scheme within the state's police power, it is not one to raise revenue, though it does so as an incident to such scheme. . . ."
Under Section 70, the "chief purpose" of the bill must be to create revenue. Glasgow v. Aetna Ins. Co., 284 Ala. 177,223 So.2d 581 (1969).
Section 11-50A-7, Code 1975, does not taint the entire Act by making it a bill to raise revenue which could not constitutionally originate in the Senate. The text of the Act clearly indicates that its "chief purpose" is the establishment of the Authority, not the raising of revenue.
(6) Is the Act a general law or a local law?
Section 110, Const. of Ala., 1901, as amended by Amendments 375 and 397, defines a general law as "a law which in its terms and effect applies either to the whole state, or to one or more municipalities of the state less than the whole in a class."
Appellant contends the Act is a local law and not a general law and therefore violates the Alabama Constitution. As to that contention, appellant argues that section 1 (f) of the Act (§11-50A-1 (6), Code 1975) distinguishes between two classes of municipalities, which renders the Act a local act because, in that respect it applies to less than the whole State as of its effective date.
We hold that the Act is clearly a "general law," as that term is defined in Section 110 of the Constitution and it could thus be lawfully passed by the Legislature without the advertisement required by Section 106 of the Constitution, as amended by Amendment 341. The Act does not constitute a local law, in that (1) it is a law which in its terms and effect applies to the whole State, and (2) the provisions of Section 1 (f) of the Act respecting criteria for membership in the Authority and the requirement of an election in those cities that did not on the effective date of the Act own and operate electric distribution systems do not classify municipalities in the State on the basis of criteria not reasonably related to the purpose of the Act.
A local law also is one that applies to a particular locality or particular localities to the exclusion of others. JeffersonCounty v. Braswell, 407 So.2d 115 (Ala. 1981). Membership in the Authority, however, is available to any city or town in the State that chooses to satisfy the statutory prerequisites.
It is our duty to construe an act as a general one when it is so worded and framed as to be reasonably susceptible to interpretation as such, in order to save its constitutionality.Brittain v. Weatherly, 281 Ala. 683, 207 So.2d 667 (1968).
 (7) Is the Act unconstitutional because it was not passed in compliance with Sections 63 and 64 of the Alabama Constitution?
 (8) Was the Senate bill of the Act so altered and amended on its passage as to change its original purpose in violation of Section 61 of the Alabama Constitution?
It is our opinion, after a thorough review of the Journals of the Legislature, that the passage of the Act through the Senate and House of Representatives was properly accomplished and all constitutional requirements applicable to its enactment were met. The trial court made proper findings of fact and conclusions of law when it answered regarding these issues:
 "(a) The Act was passed by the Legislature of Alabama in conformity with all of the requirements of the Constitution of Alabama in that (1) the Act was not so altered and amended on its passage through the Legislature as to change its original purpose in contravention of section 61 of the Constitution; and (2) the Journals of the Senate and House of *Page 480 
Representatives of Alabama reflect that (i) the bill that became the act was properly referred to a standing committee of each house of the Legislature, acted upon by such committees and returned therefrom in the manner required by section 62 of the Constitution; (ii) the Act was read on three different days in each house of the Legislature, read at length on final passage and the vote taken for and against the Act by yeas and nays with a majority of each house being recorded as voting in its favor, all in accordance with section 63 of the Constitution; (iii) the amendments that were added to the bill that became the Act were adopted by a majority of the Senate, the house of the legislature in which the bill that became the Act was offered, in accordance with section 64 of the Constitution; (iv) the Act was otherwise adopted in conformity with the requirements of section 64 of the Constitution; (v) in accordance with section 66 of the Constitution, the presiding officer of each house of the legislature, in the presence of the house over which he presided, signed the bill which became the Act after its reading at length in each house; and, (vi) in accordance with section 125 of the Constitution, the bill which became the Act was presented to the Governor of the State, and was signed prior to the expiration of ten days after final adjournment of the session of the Legislature at which the bill that became the Act was introduced."
 (9) Is Section 7 of the Act, requiring certain payments in lieu of taxes, in violation of Section 91 of the Alabama Constitution?
Section 7 of the Act (§ 11-50A-7, Code 1975) relates to tax exemptions and payments in lieu of taxation. Appellant contends that because of the nature of the Authority, it may not be indirectly subjected to ad valorem taxation as presently contemplated by the Act. In support thereof, the appellant cites to In Re Opinions of the Justices, 235 Ala. 485,179 So. 535 (1938), in which this court characterized a municipal housing authority as "a corporation brought into existence upon the order of a city government, public in nature, and charged with the duty of performing an important element of the police power of the city under whose sanction it shall come into existence." 235 Ala. at 486. The Authority, on the other hand, is a public corporation of the State, organized at the direction of the Legislature, and does not act as the agent of municipalities in the exercise of their police powers.
Section 91, Const. of Ala., 1901, as amended by Amendment No. 373 (k) provides, in part, that "[t]he legislature shall not tax the property, real or personal, of the state, counties of other municipal corporations." Because the Authority is unquestionably not a county or a municipal corporation, the only question presented here is whether the Authority, as a public corporation of the State, may partake of the State's exemption from ad valorem taxation. We hold that the property of the Authority is exempt from ad valorem property taxes and any other taxes only to the extent provided in the Act and the Authority therefore does not partake of the exemption from property taxes accorded municipal property under § 91, as amended by Amendment No. 373 (k). The Legislature may, therefore, impose on the Authority the payments in lieu of taxes described in Section 7.
 (10) Is the Authority immune from suit under Section 14 of the Constitution and may it be sued to enforce payments in lieu of taxes?
Section 14 of the Alabama Constitution provides "that the State of Alabama shall never be made a defendant in any court of law or equity." This court has held that the use of the word "State" in Section 14 was intended to protect from suit only immediate and strictly governmental agencies of the State. Exparte Board of School Commissioners of Mobile County, 230 Ala. 304,161 So. 108 (1935). In Curtis v. Alabama Elk RiverDevelopment Agency, Inc., 372 So.2d 353 (Ala.Civ.App. 1979), the Court of Civil Appeals held the acts of public corporations are not acts of the "State" *Page 481 
within the meaning of Section 14 because they are made "independent entities" by the terms of the creating act. This court, in Armory Commission of Alabama v. Staudt, 388 So.2d 991
(Ala. 1980), then added that some determination, other than the fact of incorporation, is required. There we stated:
 "Whether a lawsuit against a body created by legislative enactment is a suit against the state depends on the character of power delegated to the body, the relation of the body to the state, and the nature of the function performed by the body. All factors in the relationship must be examined to determine whether the suit is against an arm of the state or merely against a franchisee licensed for some beneficial purpose. State Docks Commission v. Barnes, 225 Ala. 403, 406-07, 143 So. 581, 584
(1932)."
In this case, the Authority exists as a public corporation separate and apart from the State. Any liabilities the Authority might incur would never be payable out of the State Treasury. The Authority does not operate as an agent of the State. And while there are certain entities which are "a part of the State" and "agencies of the State," the Authority, by the clear intent of the Act, is neither, as was meant by Section 14 of the Constitution.
 (11) Does the Act violate Sections 93 and 94 of the Alabama Constitution?
Sections 93 and 94, Const. of Ala., 1901, were designed to prevent the expenditure of public funds in aid of private individuals and corporations by reason of which a pecuniary liability is incurred. A public corporation is a separate entity from the State and from any local political subdivision thereof. The prohibitions of Sections 93 and 94 are directed to the State and not to public corporations. Opinion of theJustices, 294 Ala. 571, 319 So.2d 699 (1975); Knight v. WestAlabama Environmental Imp. Authority, 287 Ala. 15,246 So.2d 903 (1971). Therefore, the Act does not violate §§ 93 and 94.
 (12) Do the Notes constitute debts of the State in violation of Section 213 of the Alabama Constitution as amended by Amendment No. 26?
Section 213, as amended, provides that no new debt may be created by the State. This court has held time and again that public corporations are entities separate and distinct from the State and the bonds and other debts of those corporations are not debts of the State within the meaning of Section 213, as amended. Opinion of the Justices, 407 So.2d 548 (Ala. 1981);Edmondson v. State Industrial Development Authority, 279 Ala. 206, 184 So.2d 115 (1966); see also, Rogers v. Garlington,234 Ala. 13, 173 So. 372 (1937). The Authority's debts are not debts of the State; the Authority is not empowered to borrow moneys from the State for the purpose of financing any operations or activities. Therefore, the Notes do not constitute debts of the State in violation of Section 213 of the Alabama Constitution as amended.
Based on the foregoing facts in the record and applying the law to those facts, we find the judgment of the trial court is due to be affirmed, with the exception of that conclusion of law concerning notice to the municipalities under § 11-50A-11, Code 1975; that finding is due to be reversed and the case remanded for a disposition of that issue consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED; REHEARING DENIED AND OPINION MODIFIED JUNE 3, 1983.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
[1] The participants which have executed contracts with the Authority and which were joined as parties defendant pursuant to § 11-50A-11, Code 1975, are: the cities of Dothan, Alexander City, Troy, Fairhope, Lafayette, Lanette, Piedmont, and Opelika; the utility boards of Sylacauga, Foley, and Tuskegee; and the electric board of the City of Luverne. *Page 482